**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**MARIA LOPEZ on behalf of
SUKKY LOPEZ**,

        Plaintiff,

vs.                                                    CIV No. 10-1065 LFG

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Plaintiff's *Motion to Reverse and Remand for Rehearing, with Supporting Memorandum* [Doc. 16], filed April 6, 2011. Having considered the parties' submissions, the administrative record, relevant law, and otherwise being fully advised in the premises, the Court denies the motion.

**I.**    **MEDICAL HISTORY AND BACKGROUND**

The following facts are taken from the administrative record, which was lodged in this matter following Maria Lopez's filing of a *Complaint* on behalf of her daughter, Sukky Lopez. [See Docs. 1, 12].

Sukky Lopez was born July 15, 1994 to parents Victor and Maria Lopez. [AR 143]. Sukky's pregnancy was unplanned, and while Mrs. Lopez developed gestational diabetes, delivery was without complications. [AR 233].  Sukky has three brothers and one sister, and

1

is the Lopez' second eldest child. [AR 232-233].

The administrative record reveals that Mr. and Mrs. Lopez began living together when they were teenagers, and married when they were in their early 20's. [AR at 233].  According to Mrs. Lopez, the children "live[d] through years of domestic violence[,]" [id.], which started when she and Mr. Lopez began living together and continued until she pressed charges against him.  In 1999, when Sukky was 5 years old, Mrs. Lopez noticed that Sukky "would panic and become aggressive[,] especially at school." [AR 232].   Sukky demonstrated physical aggression, hitting teachers; peers; herself; doors; and walls, and throwing things.  However, once Sukky received help, she stopped striking her teachers and peers. [Id.]

In or around the year 2000, Mr. Lopez was sent to jail for 18 months, at which point he and Mrs. Lopez separated. [AR 233].  Upon his release, however, Mr. Lopez violated his parole and was returned to jail.  According to Mrs. Lopez, "the children took it hard" because they had no contact with their father, and Mr. Lopez's family refused to acknowledge them. [Id.].  As a result of her parents' separation and her father's imprisonment, Sukky became angry with her mother. [AR 232].

In 2001, Mrs. Lopez became depressed and anxious and began hearing voices.  Upon her therapist's recommendation, Mrs. Lopez was hospitalized, at which point custody of the children was turned over to New Mexico's Children, Youth and Families Department. [AR 233].  According to Mrs. Lopez, her therapist told her that she was depressed because "the children were causing [her] harm. . . ." [Id.].  Mrs. Lopez's therapist also told her that Sukky

2

"was taking her father's place and becoming the abuser." [Id.]. Although the record does not indicate when the children were returned to her, Mrs. Lopez reported "no problem getting her children back." [Id.]. Following Mr. Lopez's release from jail, he and Mrs. Lopez reunited. [Id.].

On November 17, 2006, Sukky was evaluated by licensed psychologist Michelle Pacheco for purposes of determining the need for functional family therapy ("FFT"). [AR 232-235]. Ms. Pacheco reported Sukky's mood as anxious and dysphoric; her affect as flat; and her psychomotor activity as agitated. However, Sukky also was reported to be of average intelligence; oriented to time, person, and place; goal-directed; logically coherent in thought process; and without suicidal or homicidal ideation. [AR 235]. Ms. Pacheco diagnosed Sukky as having adjustment disorder with mixed anxiety and depressed mood, and noted the following problems:

> Problems with primary support group: discord with parents and sometimes siblings; Problems related to the social environment: trouble making friends, Educational problems: does not like school, Housing problems: unsafe neighborhood; Economic problems: inadequate finances, insufficient welfare support.

[Id.]. Ms. Pacheco concluded that the Lopez family would benefit from FFT, which would allow them to address the feelings of depression, anxiety, and insecurity that were contributing to angry outbursts and aggressive behaviors, as well as explore ways to improve communications between and among family members. [Id.].

Ms. Pacheco referred Sukky to Mesilla Valley Mental Health Associates, where, on March 10, 2007, clinical psychologist David A. Sachs, Ph.D., evaluated her to assess

intellectual and cognitive functioning. [AR 284-286].  Dr. Sachs administered the following tests: WISC-III; D-KEFS Color/Word Interference; Barkley ADHD Questionnaire; and Rorschach. [AR 284].  Dr. Sachs noted that, intellectually, Sukky's verbal abilities were within the average range and her non-verbal skills in the borderline range. [Id.].  According to Dr. Sachs, Sukky's inability to attend to subtle visual clues on her Picture Assessment subtest, and her reversal of items on her Object Assembly subtest indicated "very poor attention to detail." [Id.].  Similarly, while Sukky was able to complete the most complex puzzle on her Object Assembly subtest, she missed two of the easier puzzles that required more attention to detail. [Id.].  Dr. Sachs believed that Sukky's problems were not indicative of a right hemisphere learning disability; instead, "it appear[ed] that attentional issues play[ed] a significant factor in her cognitive functioning." [AR 286].

Given her performance on the D-KEFS Color/Word Interference test, Dr. Sachs concluded that Sukky "was able to inhibit responses appropriately and to switch sets[, t]he [i]mplication [being] that she [could] exert sufficient control over behaviors so as to control some aspect of her aggressive behaviors and fighting." [AR 286].  Sukky's Barkley Questionnaire showed "sufficient indication for a diagnosis of Attention Deficit Hyperactivity Disorder." [Id.].

Finally, Sukky's Rorschach indicated fewer coping resources than would be typical, as well as difficulty with social skills. [AR 286].  More specifically, Dr. Sachs determined that Sukky experienced stress overload but did not have sufficient coping skills to deal with the degree of external stress she encountered.  Dr. Sachs also noted that Sukky "show[ed]

4

poor judgment approximately one standard deviation more often than would be expected and appropriate judgment . . . about 20 percent less than would be expected." [Id.].   Of significance to Dr. Sachs was the manner in which Sukky processed information.   He explained: "She does not readily learn from experience and clearly tends to respond to specific situations that she is dealing with rather than extrapolate generalities from her experience.   She will have a difficult time allowing herself to readily learn from experience." [AR 286].

Dr. Sachs additionally commented that Sukky (1)  was aware of and articulate on the topic of her family's poverty; (2) struggled with feelings of anger concerning the conditions under which her family operated; and (3) while capable of exhibiting control over her aggressive behaviors, lacked a sufficiently structured environment in which to do so. [AR 286]. Dr. Sachs confirmed diagnoses of adjustment disorder with disturbance of emotion and conduct, and ADHD. [Id.].   Still, he also described Sukky as "stabilized on medication." [Id.].

On July 27, 2007, when Sukky was 13 years old, Mr. Lopez applied for Supplemental Security Income ("SSI") on her behalf, explaining that Sukky had become disabled on January 1, 2007, with ADHD, and learning and antisocial disorders.  [AR 37, 142, 159].  On the *Function Report* he completed, Mr. Lopez described Sukky as, among other things, argumentative, "with LOTS of difficulty relating to siblings." [AR 154 (emphasis in original)].  Mr. Lopez stated that Sukky had difficulty going to school and would hide in the bathroom to avoid leaving the house, but then would become "very restless." [AR 152].

According to Mr. Lopez, Sukky had one friend, and was interested only in her pet pit bull, seemingly enjoying when the dog fought and killed a cat.  [AR 155].

On the topic of communicating, Mr. Lopez described Sukky as unable to (1) answer the telephone and make telephone calls; (2) deliver phone messages; (3) repeat stories; (4) tell jokes or riddles accurately; (5) explain why she did something; (6) ask for what she needed; or (7) talk with family and friends. [Id.].  In terms of her social activity and behavior with others, Sukky was described as (1) without friends her own age and unable to make new friends; (2) failing to get along with siblings and school teachers; and (3) not a participant in team sports. [AR 154].  Mr. Lopez also indicated that Sukky had trouble paying attention and sticking with tasks. [AR 156].   On the other hand, Mr. Lopez noted that Sukky "[g]enerally g[ot] along with [him and] other adults," [id.], and had no problems seeing, hearing, talking, or engaging in physical activity. [AR 151-153].

Hospital-record summaries included in *Disability Reports* reveal that, in the autumn of 2006 and the spring of 2007, Sukky visited Peak Psychiatric Hospital in Santa Teresa, New Mexico for counseling.  Peak referred her to Mesilla Valley Hospital in Las Cruces, New Mexico, where she saw Frances Glasscock, MSN, RN, CS, for outpatient counseling sessions from October 2006 through March 2008. [AR 160, 178].  Nurse Glasscock treated Sukky for clinical depression, anger, mood swings, crying bouts, isolation, and difficulty with socializing. [AR 168].  While receiving treatment at Mesilla Valley Hospital, Sukky was

prescribed Adderall, Fluoxetine, Risperdal, and Trazodone. [AR 178].[1]

In a subsequently filed (but apparently undated) *Disability Report-Appeal*, Mr.Lopez claimed that, since August 2, 2007, Sukky was experiencing new limitations as a result of her conditions, including clinical depression; lack of sleep; anger fits; temper tantrums; and bullying and fighting with her siblings. [AR 167].   When explaining how her condition affected her ability to care for her personal needs, Mr. Lopez wrote:

> Very irritable when told to bathe.  Needs constant reminder to attend to hygiene, very combative and argumentative, needs to be reminded to take medication, always very angry, always fighting with siblings, can't focus and concentrate, severe mood swings, very depressed and angry.

[AR 170].  According to Mr. Lopez, since completion of the original *Disability Report*, Sukky had become very irritable and depressed; was unable to get along with other children; and was throwing more temper tantrums. [Id.].

On September 17, 2007, Danielle Heinson, one of Sukky's teachers at Gadsden Middle School, completed a *Teacher Questionnaire* that she then faxed to the Social Security Administration. [AR 185-193].  Ms. Heinson taught seventh grade Language Arts to Sukky for half of one school year. [AR 186].  Ms. Heinson reported that Sukky had problems in the following areas: acquiring and using information, interacting and relating with others, and caring for herself. [AR 187, 189, 191].  Ms. Heinson reported no problems for Sukky in the

---

[1]  Adderall is a combination of amphetamine and dextroamphetamine that is used as part of a total treatment program for individuals with ADHD.  Fluoxetine and Trazodone are both antidepressants. Risperdal is part of a class of benzosoxazole derivatives and is used to treat schizophrenia, mania, and other abnormal mood disorders.  See PHYSICIANS' DESK REFERENCE at 1232, 1786, 3138 (57th ed. 2003).

areas of (1) moving about and manipulating objects, and (2) attending and completing tasks. [AR 188, 190].  In fact, by Ms. Heinson's assessment, when compared to a child of the same age without impairments, Sukky had no problem paying attention when spoken to; sustaining attention during play; refocusing to task when necessary; switching activities without disrupting others; and organizing her belongings. [AR 188].  Ms. Heinson did note slight problems, however, in Sukky's ability to wait to take turns; complete assignments; complete work accurately; and work at a reasonable pace. [Id.].  Still, Ms. Heinson explained that Sukky received small group instruction and class assignments "modeled" to show a visual/tactile example of her assignments, and "[o]nce [an] assignment was given, [Sukky] was quite capable and did, most of the time, complete all that was asked of her." [Id.].

Ms. Heinson additionally commented that while Sukky often did "independent" work because of others' inability to work with her, once she understood a concept, she was eager to explain it to students who were struggling. [AR 189].  On the other hand, Ms. Heinson stated that Sukky could become angry or frustrated when working with a group, and "would not restrain herself from insulting others if she was in any way uncomfortable." [AR 191]. In that situation, Ms. Heinson would separate Sukky and Sukky would "calmly complete [her] assignment." [Id.].  Sukky, whose dominant language was noted as Spanish, was rated as proficient in reading and nearing proficient in math.  [AR 186].

At about this time, Disability Determination Services ("DDS") referred Sukky to the office of psychologist James W. Schutte, Ph.D., for evaluation and assessment.  On September 30, 2007, after he met with Sukky and her father, Dr. Schutte completed a *Report*

8

*of Psychological Consultative Examination.* [AR 236-240]. Dr. Schutte reported that Mr. Lopez noted that Sukky had been aggressive since pre-school, when she spit on a teacher and pulled her hair. Mr. Lopez repeated that Sukky fights with her siblings and explained that, while Sukky "always seem[ed] sad" she never threatened to hurt herself. [AR 237]. According to Mr. Lopez, medications and monthly counseling sessions were of assistance to Sukky, and she never required hospitalization for psychiatric care. [Id.].

Sukky told Dr. Schutte that school was "kinda good" but that she occasionally was in trouble for "word fighting" and not doing her homework. [AR 237]. Sukky explained that her medications helped her to pay attention and to sit still, but that when she took them "she [did] not feel like doing anything." [Id.]. Finally, Sukky denied experiencing feelings of sadness or worry or thoughts of hurting herself, and told Dr. Schutte that she did not hear voices or see things that were not actually there. [Id.].

According to Dr. Schutte's report, Sukky was of borderline to average intelligence; her cognitive functions appeared grossly intact during his evaluation; and her attention and intelligence appeared to be within normal limits. Notwithstanding, Sukky exhibited "mild" hyperactivity during her consultation. [AR 238, 240]. Dr. Schutte's report noted diagnoses of oppositional defiant disorder, depressive disorder, and ADHD. [AR 239].

## II.   PROCEDURAL HISTORY

Sukky's application for SSI was denied on October 10, 2007. [AR 251-252]. According to DDS consultant J. LeRoy Gabaldon, Ph.D., Sukky had no limitation in the areas of moving about and manipulating objects; caring for herself; and health and physical

well-being, and exhibited a less than marked limitation in the areas of acquiring and using information and attending and completing tasks. [AR 253- 254].  Noting Sukky's "chaotic family of origin," aggression, and physical opposition, Dr. Gabaldon determined that Sukky had a marked limitation in the area of interacting and relating with others. [Id.].  Still, Dr. Gabaldon concluded that Sukky's oppositional defiant disorder, depression, and ADHD, while severe, did not meet, medically equal, or functionally equal the listings set forth in the applicable Social Security regulations. [See AR 37, 251].  Dr. Gabaldon's conclusions were upheld on reconsideration by DDS's Scott Walker, M.D., on February 13, 2008. [AR 38, 258-263].  On February 27, 2008, Sukky, pursuant to 20 C.F.R. § 416.1429, requested a hearing before an Administrative Law Judge ("ALJ").

On December 9, 2009, the ALJ, David J. Hebert, held a video hearing with Sukky and her mother in attendance in El Paso, Texas, and Judge Hebert presiding from Houston. [AR 42].  Sukky was represented by counsel. [Id.].  Mrs. Lopez testified, but Sukky did not. [AR 9-36].

At the time of the hearing, Sukky was a tenth grader at Carson High School. [AR 14].  With the exception of math, Sukky was enrolled in regular (as opposed to special-education) classes and earning B's and C's. [AR 30-31].  Through her testimony, Mrs. Lopez described her daughter as anxious, aggressive, disagreeable, and questioning of parental authority. [AR 15].  Mrs. Lopez explained that Sukky received weekly therapy from a social worker with Esperanza Guidance Services and that, through Esperanza, Sukky was seeking a referral to a psychiatrist. [Id.].  Sukky received treatment for her emotional issues since the year 2006,

even though she experienced problems since childhood. [AR 26].

According to Mrs. Lopez, Sukky had just one friend her age. Mrs. Lopez explained that it was difficult for Sukky to develop friendships because she always wanted to be the leader and group decision maker. [AR 17].  To solve interpersonal problems, Sukky wanted only to fight and was "easy to get in a fight or start a fight[,]" [id.], particularly at school, where she was known as "Sukky Balboa" in reference to the lead character from the movie "Rocky." [Id.].  Mrs. Lopez stated that Sukky was argumentative with teachers, did not get along with her siblings, and fought with family members. [AR 17, 19, 29].  At the time of the hearing, Mr. Lopez was no longer living in the family home. [AR 16].

Mrs. Lopez testified that Sukky would not express feelings, and that Mrs. Lopez "always ha[d] to push her" to do so. [AR 18].  Sukky also was described as having a difficult time asking for what she needed.  For example, if Sukky were to need her hair put in a pony tail, she would not ask Mrs. Lopez for assistance but, instead, would show that she needed help. [Id.].  Sukky required assistance in the area of personal hygiene and would neither put away clothes nor choose her own outfits. [AR 23].

Sukky was described as having trouble telling and repeating stories, since she tended to forget parts. [AR 18-19, 33].  Similarly, Sukky was unable to repeat jokes because of an inability to understand why they were funny. [AR 23].  Mrs. Lopez testified that, while Sukky was able to play games and sports, she would not follow rules and, in any event, would remain engaged for only 5 or 10 minutes before needing to move on to the next activity. [AR 19-20].

Mrs. Lopez stated that she could not send Sukky to the store to pick up groceries or other items because Sukky was unable to calculate change and also would forget what she was sent to buy. [AR 20-21].  On the other hand, Mrs. Lopez testified that Sukky was able to go to and use a library by herself, operate her MP3 player, and use Mrs. Lopez's cell phone to send and receive text messages. [AR 20, 31-32].

Although Sukky was responsible for assigned chores such as cleaning her room, taking out the garbage, and washing the dishes, Mrs. Lopez estimated that Sukky would "spend like three hours" completing these tasks. [AR 22].  Other than microwaveable instant soup, Mrs. Lopez testified that Sukky was unable to prepare food for herself. [AR 24]. According to Mrs. Lopez, Sukky's morning forgetfulness caused her to miss her school bus, making it necessary for her mother to drive her to school every morning. [Id.].

In addition to the medications listed on her *Disability Reports* (Adderall, Fluoxetine, Risperdal, and Trazodone), Mrs. Lopez testified that Sukky took naprosyn[2] twice daily for back pain. [AR 27]. Mrs. Lopez explained that Sukky suffered from back pain so severe that it prevented her from standing up or reaching down. [Id.].  Sukky saw both a medical doctor and a chiropractor for her back pain. [Id.].

Mrs. Lopez related one incident approximately two months before the hearing when Sukky attempted to hurt herself by cutting her arm. [AR 22].  Mrs. Lopez was unable to say with what Sukky cut herself. [Id.].  When asked if Sukky wanted to take more medication

---

[2]  Naprosyn is a nonsteroidal anti-inflammatory drug with analgesic properties used in the treatment of, *inter alia*, arthritis and tendinitis and for management of pain.  See PHYSICIANS' DESK REFERENCE at 2891-92 (57th ed. 2003).

than was prescribed, Mrs. Lopez stated that this was the case with the Trazodone, because Sukky liked to sleep. [AR 21].  Since Sukky would sometimes try to take more than the proper dosage, Mrs. Lopez would have to monitor and assist her. [AR 21-22].  However, when asked whether Sukky's medications were effective, Mrs. Lopez replied that "[t]hey work sometimes, but sometimes it's easy because she gets too angry, so that's why sometimes doesn't work." [AR 26].  According to Mrs. Lopez, talk therapy also helped Sukky "a little bit." [AR 30].

On February 26, 2010, the ALJ issued a written decision denying Sukky's SSI application on the ground that Sukky was not disabled under § 1614(a)(3)(C) of the Social Security Act. [AR 42-52].  While the ALJ found that Sukky had a medically determinable impairment—or combination of impairments—that was severe, her impairment (or impairments) did not meet or medically or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [AR 44-45].  In making his decision, the ALJ considered school records and medical records from physicians and psychologists. [AR 46-47].  The ALJ considered the conclusions of DDS Drs. Gabaldon and Walker. [AR 47].  Finally, the ALJ considered the testimony of Sukky's mother. [AR 46].  Following his consideration of this evidence, the ALJ found that Sukky had no limitations in the areas of moving about and manipulating objects; caring for herself; and health and physical well-being. [AR 50-52].  He found that Sukky had less than marked limitations in the areas of acquiring and using information and attending and completing tasks. [AR 47-49]. Lastly, the ALJ found that Sukky had a marked limitation with respect to interacting and relating to

others. [AR 49-50].  The Appeals Council denied Sukky's request for review. [AR 1].

On November 10, 2010, Sukky filed her *Complaint* and, on April 6, 2011, she filed the *Motion to Reverse and Remand for Rehearing with Supporting Memorandum* that is now before the Court. [Docs. 1, 16].  In her motion, Sukky argues that the ALJ's decision (1) is not supported by substantial evidence, and (2) largely makes use of boilerplate language that recites the appropriate factors for consideration but nevertheless fails to connect those factors to the relevant facts, making judicial review of his decision impossible. [Doc. 16 at 4-5]. Sukky also contends that  the ALJ failed to make specific findings regarding the credibility of Mrs. Lopez, as he is required to do under the law of the Tenth Circuit. [Id. at 5].  More specifically, Sukky insists that, contrary to what he actually concluded, the ALJ should have found that she has an extreme limitation in interacting and relating to others, and marked limitations in both acquiring and using information and caring for herself. [Id. at 5-10].

In response, the Commissioner maintains that the ALJ used the proper legal standards in reaching his decision, and the decision is supported by substantial evidence. [Doc. 17 at 1].  While the Commissioner concedes that "the ALJ could have perhaps better elucidated his findings[,]" [id. at 7], the Commissioner also submits that the ALJ has provided a sufficiently adequate rationale to allow this Court to conduct a meaningful review of his findings.  [Id.].

## III.   ANALYSIS

### A.   Standards of Review

#### 1.   General

On appeal, this Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Fowler v. Bowen, 876 F.2d 1451, 1453 (10th Cir. 1989) (internal quotations omitted). By contrast, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992).

In order to determine whether a decision is supported by substantial evidence, the Court must "meticulously" examine the record as a whole. Musgrave, 966 F.2d at 1374. However, the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Id. Accordingly, judicial review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). Still, grounds for reversal exist if the agency fails to apply the correct legal standards or demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

### 2.    **Children's Disability Cases**

In the specific context of children's disability cases,

> [a]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).  A sequential three-step process applies when making the decision whether a child meets these criteria, with the ALJ determining, in this order, that (1) the child is not engaged in substantial gainful activity; (2) the child has an impairment or combination of impairments that is severe;  and (3) the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404.  Briggs ex rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001) (citing 20 C.F.R. § 416.924(a)).

In determining whether a child's impairment meets or equals a listed impairment, the ALJ must consider whether the impairment, alone or in combination with another impairment, "medically equals, or functionally equals the listings."  20 C.F.R. § 416.924(a). An impairment is "medically equivalent" to a listing "if it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 416.926(a).

The Regulations provide that medical equivalence can be found in three ways: first, if the child has an impairment that is described in the listings, but she (1) does not exhibit one or more of the findings specified in that listing, or (2) exhibits all of the findings, but one or more of the findings is not as severe as specified in the particular Listing, the Commissioner

will find that the child's impairment is medically equivalent to that listing if the child has other findings related to her impairment that are at least of equal medical significance to the required criteria. See 20 C.F.R. § 404.1526(b). Second, if the child has an impairment that is not described in the listings, the Commissioner compares the child's findings with those for a closely analogous listed impairment and, if the findings related to the child's impairment are at least of equal medical significance to those of a listed impairment, the Commissioner will find medical equivalence. Id. Third, if the child has a combination of impairments, no one of which meets a listing, the Commissioner compares the child's findings with those for closely analogous listed impairments and if the findings related to the child's impairments are at least of equal medical significance to those of a listed impairment, the Commissioner will find the combination of impairments medically equivalent to that listing. Id.; see also Avery v. Astrue, 313 Fed.Appx. 114, 122 (10th Cir. Feb. 19, 2009).

Functional equivalence is determined by analyzing the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1); Smith ex rel E.S.D. v. Barnhart, 157 Fed.Appx. 57, 60 (10th Cir. Dec. 5, 2005).  If the child is extremely limited in one domain, or markedly limited in two domains, the impairment is functionally equivalent to the relevant listing and the child is disabled.  See 20 C.F.R. §§ 416.924(a); 926a(a).  In the context of functional equivalency, a limitation is marked if the "impairment(s) interferes seriously with [the] ability to independently initiate, sustain, or

17

complete activities."    20 C.F.R. § 416.926a(e)(2)(i). A limitation is extreme if the "impairment(s) interferes very seriously with [the] ability to independently initiate, sustain, or complete activities."    20 C.F.R. § 416.926a(e)(3)(i). Day-to-day functioning may be seriously or very seriously limited when an impairment either "limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities." 20 C.F.R. § 416.926a(e)(2)(i), (e)(3)(i).

In making the "functional equivalence" determination, the ALJ is not required to refer to specific listed impairments in determining whether an impairment functionally equals the listings; instead, the ALJ must evaluate the child's functioning in each of the six domains set forth above.  Miller ex rel. Thompson v. Barnhart, 205 Fed.Appx. 677, 679 (10th Cir. Nov. 9, 2006) (citing 20 C.F.R. § 416.926a(d)).  Before addressing functional equivalence, however, the ALJ must determine that the child's impairment neither meets nor medically exceeds a listing.  Miller, 205 Fed.Appx. at 679 (citing 20 C.F.R. § 416.924(a)).

In some instances, if the ALJ fails to identify the relevant listing or listings and, instead, simply arrives at a summary conclusion that the child's impairments do not meet or equal a listed impairment, the resulting decision may be placed "beyond meaningful judicial review."  Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).  On the other hand, the needless prolonging of administrative proceedings through unwarranted remands should be avoided and the decision upheld where the ALJ's analysis contains a sufficiently detailed discussion of the record that this Court can "'confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual

18

matter in any other way.'" <u>Fischer-Ross v. Barnhart</u>, 431 F.3d 729, 733-734 (10th Cir. 2005) (*quoting* <u>Allen v. Barnhart</u>, 357 F.3d 1140, 1145 (10th Cir.2004)).

"If the child claimant is unable to adequately describe his symptoms, the ALJ must accept the testimony of the person most familiar with the child's condition." <u>Briggs</u>, 248 F.3d at 1239 (*citing* 20 C.F.R. § 416.928(a)). Assuming that person is the child's parent, "the ALJ must make specific findings concerning the credibility of the parent's testimony, just as he would if the child were testifying." <u>Id.</u> While credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence, a credibility determination "'should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" <u>Smith</u>, 157 Fed.Appx. at 62 (*quoting* <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir.1995)). When a significant portion of the record evidence supports the testimony, the ALJ must explain why he has determined that the testimony is not credible; standard boilerplate language will not suffice. <u>Briggs</u>, 248 F.3d at 1239.

Social Security Ruling 96-7P explains:

> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported

19

> by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well- reasoned determination or decision.

SSR 96-7P 1996 WL 374186 (July 2, 2996).

> Finally, factors that are relevant to the ALJ's credibility assessment include

> > the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Sturdivant v. Astrue, 2011 WL 2580165, at *4 (W.D.Okla. Apr. 22, 2011) (*quoting* Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir.1991)).

## B.   The ALJ's Findings

### 1.   Mrs. Lopez's Credibility

Sukky argues that the ALJ failed to make specific findings regarding Mrs. Lopez's credibility, and also that his use of boilerplate language in determining functional equivalence  "prohibit[s] this Court from making an adequate review of the ALJ's reasoning." [Doc. 16 at 5].  Sukky contends that, rather than find that she has marked limitations in the domain of interacting and relating with others; less than marked limitations in the domain of acquiring and using information; and no limitations in the domain of caring

for herself, the ALJ should have found that Sukky possesses extreme limitations in interacting and relating with others, and marked limitations in acquiring and using information and in caring for herself. [Id. at 5-10].

Again, in response, the Commissioner concedes that "the ALJ could have perhaps elucidated better his findings. . . ." [Doc. 17 at 7]. Nevertheless, the Commissioner contends that substantial evidence supports the ALJ's findings and his decision, therefore, should be affirmed. [Id.].

There can be little doubt that the ALJ was not particularly expansive with respect to his finding on Mrs. Lopez's credibility. To the contrary, "terse" would be a more accurate description of his assessment of Mrs. Lopez's statements as "not generally credible." [AR 46]. In considering Mrs. Lopez's testimony, the ALJ noted that, according to Mrs. Lopez, Sukky

> is anxious and aggressive, does not get along with friends and siblings, stays to herself, does not follow rules in games or sports, for[gets] easily, has problems in math, does household chores very slowly and has to be reminded, is not good about personal hygiene, misses the bus to school, has been in treatment for mental problems for three years, and was suspended from school in the eighth grade.

[AR 46]. Yet, explained the ALJ, Mrs. Lopez also testified that Sukky (1) occasionally finds relief from her symptoms in her prescription medications; (2) attends regular (as opposed to special-education) classes and can read and write; (3) listens to music, plays with her dog, and uses her mother's cell phone to send and receive text messages,; and (4) has never been in trouble with the police. [Id.]. The ALJ additionally understood from Mrs. Lopez that

21

Sukky's prescription medications at least sometimes proved effective. [Id.].

The ALJ weighed Mrs. Lopez's testimony against record evidence gleaned from (1) Sukky's school records; (2) notes from physical examinations; (3) evaluations from examining psychologists; and (4) conclusions of non-examining DDS doctors.  That evidence revealed that, notwithstanding Sukky's anxious and aggressive nature, she had the tools to "exert sufficient control over behaviors so as to control some aspect of her aggressive behaviors and fighting." [AR 286].  Contrary to Mrs. Lopez's assertions that Sukky did not follow rules in games or sports, Sukky told Dr. Schutte that she enjoyed playing soccer and football, and Ms. Heinson reported on her *Teacher Questionnaire* that Sukky had no problem following rules in games and sports. [AR 189].  While Ms. Heinson's noting of a slight problem with Sukky's ability to play cooperatively with other children and make and keep friends is somewhat consistent with Mrs. Lopez's testimony that Sukky does not get along with friends, Sukky herself told Dr. Schutte that she does indeed have friends. [AR 237].  Dr. Schutte noted that when he met with Sukky, she appeared well-groomed. [AR 238].  Ms. Heinson similarly confirmed that Sukky had no problem taking care of personal hygiene and caring for such physical needs as dressing herself. [AR 191].  For his part, Dr. Sachs characterized Sukky as "stabilized on medication[,]" an assessment seemingly confirmed by Mr. Lopez and Sukky herself and, to an extent, Mrs. Lopez as well. [AR 26, 237, 286].[3]

---

[3] Dr. Schutte reported that Mr. Lopez stated that Sukky's medications and monthly counseling sessions were of assistance to her, and that she had never been hospitalized for psychiatric purposes.  Sukky confirmed that "her medications help[,]" though they appear to take a toll on her energy.  Mrs. Lopez testified to at least an occasional effectiveness of Sukky's prescription medications.  [AR 26, 237, 286].

Finally, although Sukky was suspended in eighth grade, the ALJ noted that she had never been in trouble with the police.  [AR 46].

The ALJ could certainly have more clearly made his credibility findings.  That said, it also is apparent that the ALJ relied on actual record evidence (which he discussed) and not "intangible or intuitive notion" when he found that Mrs. Lopez's "statements concerning the intensity, persistence and limiting effects of [Sukky's] symptoms [were] not generally credible to the extent they were inconsistent with finding that Sukky did not have an impairment or combination of impairments that functionally equal[led] the listings *for the reasons explained below*." [AR 46 (emphasis added)].  Thus, inasmuch as he concluded that Mrs. Lopez's statements were at odds with what the record evidence revealed about Sukky's condition and the persistence and intensity of her symptoms; the extent to which Sukky was able to engage in daily activities; and the effectiveness of her medications, see Sturdivant, 2011 WL 2580165, at *4, the ALJ rejected Mrs. Lopez's testimony as "not generally credible." [AR 46].  Based upon his evaluation of the entire case record, the ALJ may find all, *only some*, or none of an individual's allegations to be credible." Briggs, 248 F.3d at 239 (emphasis added, internal quotation omitted).  This is what the ALJ did here.

## 2.   Functional Equivalence

Sukky challenges the ALJ's conclusions regarding functional equivalence, asserting that he failed to evaluate the evidence as it relates to particular domains and, in any event, the evidence supports a finding that Sukky is more limited in the domains of acquiring and using information; interacting and relating with others; and caring for herself than the ALJ

23

found. [Doc. 16 at 4-11].

In this area also the Court concludes that the ALJ could more clearly have set forth his findings and rationale. However, having carefully and methodically reviewed the record and the ALJ's decision, the Court disagrees with Sukky's contention that the decision is so lacking in reasoning that the Court cannot conduct an adequate review. [See Doc. 16 at 5].

As previously stated, in making his determination as to functional equivalence, the ALJ relied on Sukky's school records, her medical records, and psychological evaluations. [AR 47]. To be sure, the *Teacher Questionnaire* completed by Danielle Heinson asked for the teacher's observations with respect to Sukky's ability to, among other things, acquire and use information; attend and complete tasks; interact and relate with others; and care for herself. [AR 186-193]. According to Ms. Heinson, Sukky demonstrated no problems in understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material; or applying problem-solving skills in class discussions. [AR 187]. Ms. Heinson noted slight problems in Sukky's ability to comprehend oral instructions; read and comprehend written materials; comprehend math problems; and express ideas in written form. [Id.].

Moreover, her 2006-2007 *New Mexico Parent Report* indicates that Sukky performed at an advanced level for English language proficiency. [AR 205]. Sukky scored in the "proficient" range for reading, and "nearing proficiency" in math and science. [AR 206]. Both Dr. Schutte and Dr. Sachs evaluated Sukky as being of borderline to average

intelligence. [AR 238, 285].

Finally, both DDS doctors who reviewed Sukky's application determined that she had a less than marked limitation in the domain of acquiring and using information, noting that, while Sukky possessed poor verbal skills, she made good grades and was not enrolled in special-education classes. [AR 253, 260]. Dr. Gabaldon additionally noted that Sukky had "no problems communicating." [AR 253, 260]. The ALJ specifically concurred with these doctors' findings, which he noted deserved at least some weight, if not the amount of weight accorded the determinations of Sukky's treating psychologists. [AR 47].

Having considered the entire record, the ALJ found that Sukky possessed a less than marked limitation in the domain of acquiring and using information. [AR 48]. Sukky argues that he should have found that she is markedly limited in this domain. [Doc. 16 at 7-9]. The record includes evidence both positive and negative with respect to Sukky's ability to acquire and use information. See Hilson v. Barnhart, 64 Fed.Appx. 134, 136 (10th Cir. Apr. 21, 2003) (existence in record of evidence both positive and negative about claimant's concentration problems did not compel determination that her limitations were marked, rather than moderate, as ALJ found). Simply because two inconsistent conclusions could be drawn from the same evidence does not prevent the ALJ's findings from being supported by substantial evidence. See Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). It is not for this Court to reweigh the evidence, see Hamilton v. Sec'y of Health & Human Servs. of U.S., 961 F.2d 1495, 1498 (10th Cir. 1992), yet that is what Sukky requests when she insists that she is more limited than the ALJ found. Accordingly, the Court concludes that substantial

evidence supports the ALJ's decision with respect to this domain and, further, that he applied the correct legal standards in making his determination.

Sukky next contends that the ALJ erroneously determined that she is markedly limited in the domain of interacting and relating with others, whereas she actually should have been deemed extremely limited. [Doc. 16 at 5-7].

The ALJ noted Mrs. Lopez's testimony that Sukky "has very antagonistic behaviors, and has difficulty getting along with friends and siblings." [AR 46].  This testimony was supported, in part, by Ms. Heinson's observation on her *Teacher Questionnaire* that, overall, Sukky had problems interacting with and relating to others. [AR 189].  However, the ALJ specifically found that "*school records from teachers*. . . do not support the allegations of disabling symptoms. . . ." [AR 46 (emphasis added)].  In fact, Ms. Heinson noted that Sukky was eager to explain concepts to other students who were having trouble understanding. [AR 189].  Also, notwithstanding Mrs. Lopez's testimony, Sukky told Dr. Schutte that she had friends. [AR 237].  The ALJ specifically referenced Dr. Schutte's report in his decision. [AR 47].  Finally, both DDS doctors who reviewed Sukky's application determined that she had a marked limitation in the domain of interacting and relating with others. [AR 253, 260]. The ALJ concurred with these doctors' findings, according them the weight he believed they deserved.  [AR 47].  Again, this Court cannot reweigh the evidence, which arguably demonstrates a range of abilities for Sukky in the area of relating and interacting with others, nor can the Court substitute its judgment for that of the fact-finder.  See Lax, 489 at 1084; Hamilton, 961 F.2d 1498.  Substantial evidence supports the ALJ's determination regarding

this domain.

As her final challenge, Sukky argues that the ALJ should have found that she has a marked limitation in the domain of caring for herself instead of determining, as he did, that she has no limitation in this domain. [Doc. 16 at 9-10].

In this domain, the ALJ noted Mrs. Lopez's testimony that Sukky has difficulty going to school and misses her school bus. [AR 46]. He also considered Mrs. Lopez's testimony that Sukky is not good about personal hygiene. [Id.]. On the other hand, the ALJ considered record evidence tending to show that Sukky (1) *does* attend school on a daily basis and is making good progress toward her educational goal; (2) is progressing well in the classroom; and (3) is capable of controlling her aggression. [AR 47]. The ALJ also concluded that Sukky "makes progress towards behavior at home and daily living needs." [Id.].

In the school records the ALJ considered, Sukky was observed to have an overall problem caring for herself, but she also was deemed able to handle the following tasks, among others, with no problem: (1) dealing with frustration appropriately; (2) tending to her personal hygiene; (3) caring for her physical needs; and (4) using good judgment. [AR 191]. At the same time, slight problems were noted in Sukky's ability to exercise patience, appropriately assert her emotional needs, and use appropriate coping skills. [Id.]. Both DDS doctors who reviewed Sukky's case concluded that she had no limitation in this domain. [AR 254, 261]. The ALJ expressly cited the DDS doctors' opinions, concurring in their conclusions. [AR 47]. It is not for this Court to substitute its discretion for that of the ALJ, see Musgrave, 966 F.2d at 1374, even if the Court were to make a different decision had it

27

served as the finder of fact, see White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2001). The Court concludes that substantial evidence supports the ALJ's determination that Sukky has no limitations in the domain of caring for herself.

## III.    CONCLUSION

Once again, this Court's task is not to reweigh the evidence but, instead, to review the ALJ's decision to determine whether (1) the factual findings are supported by substantial evidence, and (2) the ALJ applied the correct legal standards. See Hamlin, 365 F.3d at 1214. In this case, the ALJ's decision is certainly not a model of clarity, but neither does the Court believe that the ALJ's reasoning is so deficient or his application of law to facts so inadequate as wholly to prevent meaningful judicial review. See Clifton, 79 F.3d at 1009. Instead, the ALJ made specific reference to various portions of Mrs. Lopez's testimony, which he then weighed against evidence taken from school records describing Sukky's functioning in an educational environment; medical records documenting her physical examinations; and psychological examinations detailing the effects of her ADHD and other disorders on her capabilities and functioning. [AR 46-47]. Having considered the ALJ's findings in conjunction with the entire administrative record, this Court believes that it can glean sufficient rationale from the ALJ's decision to conduct a meaningful review, and that remand under the circumstances would result in the unwarranted and needless prolonging of these administrative proceedings. See Fischer-Ross, 431 F.3d at 733-734. Accordingly, for the reasons set forth above, the Court will deny the *Motion to Reverse and Remand for Rehearing, with Supporting Memorandum* [Doc. 16].

**IT IS FURTHER ORDERED** that Plaintiff's *Motion to Reverse and Remand for Rehearing, with Supporting Memorandum* [Doc. 16] is **DENIED**.

**IT IS FURTHER ORDERED** that this matter is **DISMISSED** with **PREJUDICE**.

_____
Lorenzo F. Garcia
United States Magistrate Judge